## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| **AUGUST GUANG,** | : | |
| *Plaintiff* | : | |
| **v.** | : | **C.A. No. 23-cv-** |
| | : | |
| **CITY OF PROVIDENCE, by and** | : | **Jury Trial Demanded** |
| **through its Treasurer, Lance** | : | |
| **Cardillo,  DAVID IMPAGLIAZZO** | : | |
| **alias, CHARLES VIEIRA, alias, and** | : | |
| **JOHN DOE, alias, individually and in their** | : | |
| **official capacities as police officers in the** | : | |
| **City of Providence Police Department,** | : | |
| *Defendants* | : | |

### COMPLAINT

### I.    Introductory Statement

This action is brought by the Plaintiff seeking declaratory and injunctive relief and compensatory and punitive damages for acts and/or omissions of Defendants in violation of Plaintiff's rights to freedom of speech, unreasonable search and seizure, and malicious prosecution under the First, Fourth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, Article 1, §§ 2, 6, and 21 of the Rhode Island Constitution, and under the laws of the State of Rhode Island.

### II.    Parties

1.      Plaintiff August Guang ("Plaintiff Guang") is a resident of the City of Providence, County of Providence, and State of Rhode Island.

2.      Defendant City of Providence ("City") is a duly authorized and organized municipality under the laws of the State of Rhode Island and is sued by and through its Acting Treasurer, Lance Cardillo, alias, the official designated by state law, R.I. Gen. Laws § 45-15-5, to be named in a suit for relief against the City.

3.      Defendant Officer David Impagliazzo ("Defendant Impagliazzo"), alias, is sued individually and in his official capacity as a police officer in the City Police Department.

4.      Defendant Sergeant Charles Vieira, alias, is sued individually and in his official capacity as a police officer with supervisory authority in the City Police Department.

5.      Defendant John Doe Officer ("Defendant Doe"), alias, is sued individually and in his official capacity as a police officer in the City Police Department.

### III.    Jurisdiction

6.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, 1367, 2201 and 2202.

### IV.    Venue

7.      Venue is proper in this Court since, on information and belief, all of the Defendants reside or may be found in the District of Rhode Island in compliance with the requirements set forth in 28 U.S.C. §1391.  Venue is also proper because a substantial part of the events or omissions giving rise to the claims occurred in the District of Rhode Island.

### V.    Material Facts

#### A.  Background Facts

8.      Since 2015, Plaintiff Guang has served in the greater Providence community as a volunteer medic at social justice events in Rhode Island, including protests.

9.      Over the spring and summer of 2020, preceding the events at issue in this Complaint, the United States in general, including Providence, Rhode Island, was the scene of massive protests opposing police brutality, violence, racism, lack of accountability, and abuse of power.

10.    Police across the United States, as well as police in Providence, responded to these protests by using violent and aggressive tactics against protestors, including the use of chemical weapons, physical violence, and baseless arrests.

11.    Community members with introductory training in emergency medical response volunteered throughout these protests as neutral volunteer medics, whose primary role was to support the health and safety of the protestors in the face of physical violence, chemical weapons, and other tactics on the part of law enforcement that could and often did cause physical injury to protesters engaging in their constitutionally protected right to free expression.

12.    In addition to responding to physical injuries caused by police, volunteer medics like Plaintiff Guang attended to the overall well-being of community members who participated in protests, including prevention of seasonal risks such as heatstroke or frostbite, and assistance for special populations, such as elders at marches who may experience difficulties due to physical exertion.

13.    Along with handing out water bottles, handwarmers, and band-aids, medics such as Plaintiff Guang were prepared to provide on-site emergency medical care if needed.

14.    Before taking on the role of volunteer medic, Plaintiff Guang completed twenty (20) hours of training for which they received a certificate.

15.    In their role as a volunteer medic, Plaintiff Guang did not participate in demonstrations but remained on the lookout for anyone appearing to need medical attention.

### B.  Chronology of Events

16.    On or about October 21, 2020, Plaintiff was asked to be a volunteer medic at a protest planned to start later that same day beginning at Councilman Miguel Luna Park on Sackett Street in Providence, at 8 p.m.

17.    The protest was in response to the near death of then twenty-four (24) year-old Jhamal Gonsalves ("Mr. Gonsalves") on October 18, 2020, when Providence Police Officer Kyle Endres engaged in an aggressive and dangerous vehicle chase of the young moped rider, telling a fellow officer to "box him in."  As a result, Mr. Gonsalves suffered severe injuries, and remained in a coma for approximately two months.

18.    Activists also planned to protest violent tactics and baseless arrests the Providence Police had used against protesters the day before who had also been expressing their opposition to Providence Police conduct and the resulting injuries sustained by Mr. Gonsalves a few days earlier.

19.    Plaintiff agreed to be one of the volunteer medics for the protest, along with another volunteer medic, Tycho Horan.

20.    Plaintiff arrived at approximately 8 p.m., met their fellow medic, and introduced themselves and their services while waiting for the protest to begin.

21.    Protesters began to march between about 8:30 p.m. and 8:45 p.m., beginning the march by heading north on Broad Street.

22.    At this point Plaintiff estimates there were approximately fifty (50) protesters present.

23.    The protesters were marching in the street, as had been the norm during numerous protests throughout the summer and fall with the acquiescence of the police who allowed protesters to march in the streets, blocking traffic in both directions, without taking any action or asking protesters to change their behavior.

24.    However, unlike many other marches during this period, where protestors marched in both directions and thereby blocked the roads, during this march the protesters only blocked one lane of traffic, allowing cars to go around the protesters and pass easily.

25.     Plaintiff followed behind the demonstrators, alert for any signs of health problems among the protesters, whether caused by police or other factors.

26.     At or around 9 p.m., the protesters reached the police station at the corner of Broad Street and Moore and chanted for several minutes without incident.

27.     During this stationary period, the protesters also did not completely block traffic, continuing to allow vehicular traffic to pass in one lane.

28.     Protesters then continued to march, heading north to Whitemarsh Street, turning left, and meandering through side streets until they reached Elmwood Avenue, turned left, and headed south on that street.

29.     Eventually, Plaintiff and the other medic stopped to provide medical attention to someone who had developed blisters on their feet, providing heel pad bandages.  When Plaintiff finished attending to the marcher, they looked up and saw that the rest of the march had already travelled several blocks farther down the street.

30.     Knowing that there were other medics who had continued with the crowd of marchers, Plaintiff and the other medic decided to return to the car and monitor livestream video in case anyone needed medical attention.

31.     Shortly before 10 p.m., Plaintiff and their fellow medic saw live video stream on social media platforms of police using chemical weapons and rushed to the scene to offer medical care to the people exposed.

32.     Plaintiff and their fellow medic rejoined the march before 10:30, enlisting a friend to drop them off at the corner of Park and Elmwood Avenues because Elmwood Avenue was blockaded by police.

33.     Plaintiff monitored the crowd, asking marchers if anyone was injured or needed water in response to the OC spray.  One person asked for water to rinse the toxin from their skin.

34.     By this point, the march had largely broken up, most people were standing on the sidewalks, and people were generally just trying to stay safe as police were attacking and pepper spraying people without provocation or warning.

35.     Some of the protesters and bystanders were talking among themselves while some protesters were still chanting and yelling.

36.     There was still a great deal of activity, however, and several officers were chasing and attacking people while Plaintiff was checking with those who had been exposed to the OC spray to see if they needed medical attention.

37.     Many of the protesters had disbursed at this point but police officers from Providence, Cranston, and the Rhode Island State Police, continued to arrive.

38.     As more protesters dispersed and more police arrived, the police presence became completely overwhelming, outnumbering the remaining protesters and bystanders.

39.     At least fifty (50) police were massed along Elmwood Avenue close to Hathaway Street at the Providence-Cranston border.

40.     Equipped with riot gear and large batons, these officers formed a line across the width of the street, two or three police officers deep, facing perhaps a half dozen protesters who remained, mostly standing around on the sidewalks doing nothing, along with neighbors who were watching.

41.     Defendant Vieira, who had been on scene with the Cranston Police force before the protesters and the contingent of Providence Police arrived, was now commanding this multi-jurisdictional phalanx of police.

42.     Defendant Vieira explicitly ordered the officers who were in formation to spread out and cover the sidewalks as well as the street and asked for eight (8) people to be an arrest team.

43.     Defendant Impagliazzo responded enthusiastically to Vieira's request saying "Aw, dibs!" as if the opportunity to arrest people were a game or a sporting activity.

44.     Defendant Vieira lined up his team of eight (8) officers, apparently to pursue the eight or so protesters who remained in the middle of Elmwood Avenue, just north of the area where officers from Providence and other jurisdictions were amassed.

45.     The police began marching forward in formation, chanting in unison, "Move back!"

46.     Plaintiff stayed on the sidewalk, out of the way of police or protesters, and moved back when ordered, now unable to provide any medic support due to the chaos of the police movement.

47.     The eight or so individuals who were in the street ran away, many toward the left of the officers who rushed at them.

48.     At no point was Plaintiff in the street or doing anything other than attempting to serve as a resource for people needing medical support.

49.     Plaintiff stayed nearby to monitor the situation and offer any medical assistance needed, focusing on the marchers rather than watching the police.

50.     The police started to march forward and then stop a few times, until without warning or provocation, suddenly charged at full speed toward the few remaining protesters on the street, as well as anyone else simply standing on the sidewalk, including Plaintiff, and random neighbors and other bystanders who happened to be in the area.

51.     Defendant Impagliazzo broke away from the line to run up onto the sidewalk, and without saying anything to Plaintiff Guang, rushed at them and tackled them to the ground.

52.     When Defendant Impagliazzo tackled Plaintiff Guang to the ground, Plaintiff landed hard on the shoulder, with the entire weight of Defendant's body on top of them, causing Plaintiff to cry out in pain.

53.     Defendant Impagliazzo and Defendant Doe together put zip tie handcuffs on Plaintiff Guang, as Plaintiff yelled to let police know that they were a medic, and that their shoulder, already injured from crashing to the ground, felt like it might be close to being dislocated because Defendants were pulling Plaintiff's arms upward with extreme force, even though Plaintiff was not resisting.

54.     After Defendants finished handcuffing Plaintiff, they pulled them to their feet, and walked Plaintiff toward the waiting police van.

55.     Plaintiff explained, multiple times, that they were at the protest in the capacity of volunteer medic, and that they were carrying medical supplies in their backpack.

56.     The backpack Plaintiff carried was black, with large red crosses on it to communicate the availability of medical assistance.

57.     When Plaintiff entered the police van, they saw a person who had been standing near them on the sidewalk and told the person their name and that they were at the protest as a medic.

58.     The other person, Chloe Davis, told Plaintiff that she was a legal observer.

59.     The next arrestee to climb in was a young Black man who kept saying he had no idea why he was arrested.

60.     He said he had just walked over when he saw an enormous display of flashing police lights and wanted to see what was going on.

61.     He said he saw the police running towards him and he did not even bother to run away, he just pressed himself against the building behind him to let the police run past him, but that they grabbed him and arrested him, and no one would tell him why.

62.     Eventually the police put six (6) arrestees in this van.

63.     All the arrestees were wearing masks due to the COVID-19 pandemic, and there was no ventilation in the van, making breathing difficult.

64.     Some of the arrestees shouted to ask the police to open the door or a window to let air flow in but the police did not respond.

65.     The police eventually drove Plaintiff and the other arrestees to the Providence Public Safety Complex.

66.     Plaintiff was taken upstairs together with Ms. Davis and away from the other people in the van, and told to sit, still handcuffed, in semi-open cement rooms.

67.     Eventually a police officer came and uncuffed Plaintiff.

68.     Upon removing and searching Plaintiff's backpack, Defendant Impagliazzo said in apparent surprise, "You do have medical supplies in here!" or words to that effect.

69.     A higher-ranking police officer, denoted by his white shirt, believed to be Defendant Vieira, kept walking past Plaintiff and telling the officers in the area that any officer who had been involved in an arrest needed to meet with him downstairs where they would all write one police report together.

70.     Plaintiff was taken away to be processed and then brought to a cell.

71.     The freezing cold cell Plaintiff was placed in had only a metal bench, a metal toilet and sink, a small roll of toilet paper, and two cereal bars.

72.     Eventually, officers came to take Plaintiff out of the cell for more processing.

73.     A tall officer, speaking in an aggressive manner, told Plaintiff to take their mask off.

74.     When Plaintiff replied, "Maybe you should put a mask on," the tall police officer yelled at them to "[s]hut the fuck up!"

75.    Plaintiff removed their mask and noted that all of the police officers were unmasked as well, which made Plaintiff very nervous due to the on-going COVID-19 pandemic, in particular the very high infection rate in Rhode Island at this time, well before vaccines were available.

76.    Other than a brief moment when Plaintiff had their picture taken, there was no reason to force Plaintiff Guang to remove their mask during the processing.

77.    After a painful and sleepless night, Plaintiff was taken to the Rhode Island Sixth Division District Court in Providence.

78.    Plaintiff was arraigned and released on personal recognizance shortly before noon.

79.    Plaintiff was charged with disorderly conduct under R.I. Gen. Laws § 11-45-1(a) and given a court date for a pre-trial conference on December 9, 2020.

80.    Plaintiff retained private counsel to defend them against the baseless criminal charge.

81.    The December 9 pre-trial conference was cancelled, and the following day, Defendant City's prosecutor, Sara Pierson ("Attorney Pierson") offered to dismiss the baseless charge under R.I. Dist. R. Crim. P. 48(a) on the condition that Plaintiff complete twenty-five hours of community service.

82.    Initially, Plaintiff Guang communicated through counsel to Attorney Pierson that they would be willing to complete twenty hours of community service as a condition for dismissal of the criminal case.

83.    Plaintiff Guang was prepared to accept Defendant City's proposal including community service as a condition of dismissal in part because Plaintiff regularly performed public service on their own accord, and mainly to avoid the onerous conditions of bail.

84.    In Rhode Island, bail conditions forbid an accused person to step outside the borders of this tiny state without first seeking and obtaining permission from the Court, thereby restricting

their liberty even for every-day activities such as household shopping or crossing state borders for intra-state travel.

85.    Plaintiff Guang had already gone seven (7) weeks without any pre-trial conference or other court activity, and was concerned about the length of time that they might remain on bail.

86.    As long as the criminal charge against Plaintiff remained pending, it was posted on the Rhode Island Judiciary's public portal for all the world to see.

87.    The reason the City prosecutor gave for not agreeing to a dismissal without conditions was that she had not seen body-worn camera (BWC) video footage of Plaintiff Guang's arrest.

88.    Despite the multiple negative consequences of remaining on bail, Plaintiff decided in early January, 2021 not to perform community service.  They informed the City prosecutor, through counsel, of their decision, explaining that Plaintiff "did not commit any crime, there was no probable cause for their arrest, and they should not be prosecuted."

89.    Still, Plaintiff's criminal defense attorney was not able to view any of the BWC video footage until January 28, 2021, three months after Plaintiff was arrested, and the same day that Plaintiff filed a Motion to Compel Discovery.[1]

90.    As late as February 24, 2021 – four months into the prosecution – the City prosecutor still had not reviewed video footage from Defendant Impagliazzo's BWC, and was unaware of the circumstances surrounding the arrest of Plaintiff.

91.    When Attorney Pierson finally watched the body-cam footage from Defendant Impagliazzo, she could not identify any footage of Plaintiff Guang, much less video showing any alleged illegal conduct.

---

[1] Originally, Defendant City refused to provide Plaintiff Guang with download access to BWC video, in violation of R.I. Dist. R. Crim. P. 16(b), making it impossible for Plaintiff or their attorney to view the evidence without their login and viewing being monitored by evidence.com or its parent company Taser International.

92.     Finally, on March 23, 2021, Defendant City dismissed the charges against Plaintiff Guang under R.I. Dist. R. Crim. P. 48(a) with no conditions.

### C.  Municipal Liability

93.     At least three Police Officers in the employ of Defendant City, Defendants Impagliazzo, Doe, and Vieira were unaware of the Plaintiff's constitutional right to assemble and move freely about on public sidewalks and other public fora.

94.     On information and belief, this lack of awareness is widespread among Defendant City police officers.

95.     Upon information and belief, based on a Police Academy Curriculum used by Defendant City and sworn testimony, of eight hundred plus (800+) hours of Academy training, only three (3) to thirteen (13) hours are spent on training in anything remotely relevant to understanding, respecting, and protecting the civil and constitutional rights of citizens, and such training is the only constitutional and civil rights training officers receive before or during their employment with Defendant City's Police Department.

96.     This lack of knowledge on the part of officers has continued despite a series of lawsuits in which the Defendant City has been sued for the same or similar Fourth Amendment and free speech violations.  *See e.g. Reilly v. Providence*, No. CA 10-461 S, 2013 WL 1193352 (D.R.I. Mar. 22, 2013); *Prince v. Providence*, C.A. No. 15-378M (D.R.I); *Kurland and Gould v. Providence*, C.A. No. 14-0524-WES-PAS (D.R.I); *Pombo v. Providence*, C.A. No. 1:15-cv-00291-ML-LDA (D.R.I); *Kurland v. Providence*, C.A. No. 18-cv-00440-MSM-LDA, *Davis v. Providence,* C.A. No. 21-490-JJM-LDA, two of which resulted not only in settlements but a consent decree or stipulation outlining proper constitutional limits to policing of protesters.

97.     Per the sworn testimony of Defendant City police officers, Defendant City has taken no action to properly supervise and/or notify, educate, and/or train City police officers relative to the rights of civilians to peaceably exercise First Amendment rights in public fora such as streets, sidewalks, and parks, and even in their own front yard, without interference by law enforcement.

98.     Indeed, per the sworn testimony of Defendant City police officers, Defendant City generally provides no information about the filing of suits against Defendant City police officers and Defendant City police department either when the cases are filed or when they are resolved, even in the case of resolution via a court sanctioned consent decree imposing prospective obligations on the Defendant City police department.

99.     In contravention of Municipal Ordinance § 2-98, Defendant City's Law Department fails to inform its legislative branch of cases filed alleging civil rights violations.

100.    Per the sworn testimony of Defendant City police officers, Defendant City certainly took no action and provided no direction or training to prevent repeats of this unlawful behavior on the part of Defendant City.

101.    Indeed, per the sworn testimony of Defendant City police officers, Defendant City, and its former Police Chief and Public Safety Commissioner, it appears that no officer has even been disciplined, retrained, or ever spoken to about these issues, while some officers have been promoted after committing flagrant violations of civilians' rights under the First Amendment.

102.    Defendant City's former Police Chief Hugh T. Clements has, in sworn testimony, during his tenure as Chief of Police, endorsed the unlawful behavior of Defendant City police officers interfering with the peaceable exercise of First Amendment rights in public fora such as streets and sidewalks, and while he was Chief of Police indicated that he believed the Providence Police Department should continue to act in this unlawful manner.

103.    Former Chief Clements has also indicated in sworn testimony that he and former Public Safety Commissioner Paré were the chief policy making officials for Defendant City's Police Department at the time of Plaintiff's arrest.

104.    Defendant City failed to properly select, train, instruct, supervise and/or discipline officers in the City Police Department, including Defendants Impagliazzo and Vieira, relative to the constitutionally protected right of people to peaceably assemble and/or exercise other Fourth and/or First Amendment rights on public sidewalks and in other public fora.

105.    As is apparent by the disturbing regularity of such events, a custom or policy exists in the City Police Department wherein the Defendant City has acquiesced to, permitted, condoned and/or encouraged the deprivation of the constitutionally protected right of people to peaceably assemble and/or exercise other Fourth and/or First Amendment rights on public sidewalks and in other public forums.

106.    The Defendants knew or should have known that arresting Plaintiff Guang, and otherwise interfering with the Plaintiff's peaceful assembly on a public sidewalk, particularly where there was no obstruction of the sidewalk, was unlawful under the circumstances based on well settled law.

107.    Despite such knowledge, the Defendants, by and through their policy-making officials and agents, approved, acquiesced to, condoned, intentionally ignored, or were deliberately indifferent to such practice, and failed to change or eliminate such unlawful custom or policy.

### D.    Intentional Conduct

108.    At all relevant times, Defendants acted intentionally, willfully, maliciously, and/or with reckless or callous indifference to Plaintiff's clearly established constitutional rights.

109.    Furthermore, at all relevant times, Defendants knew or should have known that their conduct would cause or contribute to the deprivation of Plaintiff's clearly established constitutional rights.

110.    At all relevant times, Defendants were motivated by malice, wantonness and/or willfulness of an extreme nature.

### E.    Irreparable Harm and Damages

111.    The Defendants' actions have placed Plaintiff in the position of either refraining from constitutionally protected conduct or facing arrest and criminal prosecution.

112.    Indeed, Defendant City Officers attacked and arrested Plaintiff for merely being present at a protest and attempting to support the physical health and safety of others as part of their role as a volunteer medic.

113.    As a direct and proximate result of the Defendants' acts and/or omissions, including, but not limited to, those described herein, the Plaintiff has suffered and will continue to suffer deprivation of their right to freedom of expression under the First Amendment, and has thereby sustained and will continue to sustain irreparable harm.

114.    As a direct and proximate result of the Defendants' acts and/or omissions, including but not limited to those described herein, the Plaintiff has suffered and will continue to suffer mental anguish, pain and suffering, physical injury, impairment of their freedom of expression rights, deprivation of their civil rights, expenses for legal services, and other great damage.

## VI.    Claims for Relief

115.    Plaintiff incorporates in the counts below the allegations contained in ¶¶1 through 114 above.  Each count set forth lies against all Defendants, relying on each and every theory supported by the facts alleged herein. [2]

### Count One
*Impairment of Freedom of Assembly and Speech in Violation of the First and Fourteenth Amendments, Actionable Pursuant to 42 U.S.C. § 1983*

116.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of and/or placed unlawful restrictions on her freedom of expression in violation of Plaintiff's right to assemble and/or exercise other First Amendment rights on public sidewalks and in other public fora, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the First and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

### Count Two
*Impairment of Freedom of Assembly and Speech in Violation of Article 1, § 21 of the Rhode Island Constitution*

117.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have deprived Plaintiff of and/or placed unlawful restrictions on her freedom of expression in violation of Plaintiff's right to assemble and/or exercise other First Amendment rights on public sidewalks and in other public fora, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights

---

[2] In a Complaint, a Plaintiff is only required to plead facts, not legal theories. *See Johnson v. City of Shelby*, 574 U.S. 10 (2014) (Per Curiam) (reversing Fifth Circuit and holding that only facts need to be pled in a complaint, not legal theories). Plaintiff is only required to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U. S. 544, 569-70 (2007); *Ashcroft v. Iqbal*, 556 U. S. 662 (2009). Plaintiff need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED.R.CIV.P 8(a)(2). "Each allegation must be simple, concise, and direct. No technical form is required." FED.R.CIV.P. 8(d)(1).

secured under Article 1, § 21 of the Rhode Island Constitution, actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

### Count Three
**Excessive Force in Violation of the Fourth and Fourteenth Amendments,
Actionable Pursuant to 42 U.S.C. § 1983**

118.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff's right to be free from unreasonable search and seizure, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

### Count Four
**Excessive Force in Violation of Article 1, § 6 of the Rhode Island Constitution**

119.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff's right to be free  from unreasonable search and seizure, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, § 6 of the Rhode Island Constitution, actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

### Count Five
**False Arrest in Violation of the Fourth and Fourteenth Amendments,
Actionable Pursuant to 42 U.S.C. § 1983**

120.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff's right to be free from unreasonable search and seizure, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

### Count Six
### *False Arrest In Violation of Article 1, § 6 of the Rhode Island Constitution*

121.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have violated Plaintiff's right to be free  from unreasonable search and seizure, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under Article 1, § 6 of the Rhode Island Constitution, actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

### Count Seven
### *Malicious Prosecution in Violation of the Fourth, Fifth, and Fourteenth Amendments, Actionable through 42 U.S.C. § 1983*

122.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff without probable cause and with malice, which were terminated in favor of the Plaintiff, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of rights secured under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983.

### Count Eight
### *Malicious Prosecution in Violation of Article 1, §§ 2, 6 and 7 of the Rhode Island Constitution*

123.    Defendants, acting under the color of state law, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and prosecuted against Plaintiff, without probable cause and with malice, which were terminated in favor of the Plaintiff, causing Plaintiff to suffer harm as aforesaid, and have thereby deprived Plaintiff of her rights secured under Article 1, §§ 2, and 6 of the Rhode Island Constitution, directly actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989).

### Count Nine
#### *Common Law Assault*

124.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused Plaintiff to be in fear of imminent bodily harm, in violation of the common law of the State of Rhode Island, causing Plaintiff to suffer harm as aforesaid.

### Count Ten
#### *Common Law Battery*

125.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused an unwanted and offensive touching, in violation of the common law of the State of Rhode Island, causing Plaintiff to suffer harm as aforesaid.

### Count Eleven
#### *Common Law False Arrest and False Imprisonment*

126.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, intentionally imposed by force and/or threats an unlawful restraint on Plaintiff, arresting her without probable cause and restraining her freedom of movement and restricting her liberty, including handcuffing her, locking her in a police van, and holding her in a detention cell, all without legal reason or justification, while Plaintiff was at all times conscious of her confinement, in violation of the common law, causing Plaintiff to suffer harm as aforesaid.

### Count Twelve
#### *Common Law Malicious Prosecution*

127.    Defendants, by their individual and/or concerted acts and/or omissions, including but not limited to those described herein, have caused criminal charges to be brought and

prosecuted against Plaintiff without probable cause and with malice, which were terminated in favor of the Plaintiff, in violation of the common law, causing Plaintiff to suffer harm as aforesaid.

## VII.    Prayers for Relief

**WHEREFORE,** Plaintiff prays that this Court grant the following relief:

1.      A preliminary and permanent injunction restraining and enjoining Defendants from interfering with the exercise of the Plaintiff's right to provide volunteer medic support and/or exercise other First Amendment rights on public sidewalks and in other public fora guaranteed by the First and Fourteenth Amendments to the United States Constitution and Article 1, § 21 of the Rhode Island Constitution.

2.      Preliminary and permanent injunctions directing the Defendant City to properly select, train, instruct, supervise and/or discipline officers in the City Police Department relative to the constitutionally protected right of people to observe and record police behavior, to peaceably assemble and/or exercise other First Amendment rights on public sidewalks and in other public fora in the City.

3.      Preliminary and permanent injunctions directing the Defendant City to properly select, train, instruct, supervise and/or discipline officers in the City Police Department relative to the constitutionally protected right of people to move about peaceably and freely on public sidewalks and in other public fora in the City.

4.      Preliminary and permanent injunctions requiring Defendants to seal and destroy the records derived from Plaintiff's unlawful arrest, including all photographs, fingerprints and other identification or descriptive information.

5.      A declaratory judgment that the Defendants, in the manner described herein violated the First and Fourteenth Amendments to the United States Constitution and Article 1, § 21 of the Rhode Island Constitution by impairing Plaintiff's rights to freedom of assembly and speech.

6.      A declaratory judgment that the Defendants, in the manner described herein, violated the First and Fourteenth Amendments to the United States Constitution and Article 1, § 6 of the Rhode Island Constitution by violating Plaintiff Guang's right to be free from unreasonable search and seizure.

7.      A declaratory judgment that the Defendants, in the manner described herein, violated Plaintiff's right to be free from malicious prosecution under the Fourth, Fifth and Fourteenth Amendments to the United States Constitution, actionable pursuant to 42 U.S.C. § 1983, Article 1, §§ 2 and 6 of the Rhode Island Constitution, directly actionable in accordance with *Jones v. State of Rhode Island*, 724 F. Supp. 25 (D.R.I. 1989), and under the laws of the State of Rhode Island.

8.      An award of compensatory damages.

9.      An award of punitive damages.

10.     An award of reasonable attorney's fees and costs of litigation to Plaintiff pursuant to 42 U.S.C. § 1988.

11.     Such other and further relief as this Court deems just and proper.

## VIII.   Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX.     Designation of Trial Counsel

Plaintiff hereby designates Shannah M. Kurland, Esquire, as trial counsel.

Plaintiff,
By their attorneys,

**Date:  October 19, 2023**                    **/s/ Shannah M. Kurland**
                                               **Shannah M. Kurland, Esq**. (#9186)
                                               **Richard A. Sinapi, Esq. (#2297)**
                                               2374 Post Road, Suite 201
                                               Warwick, RI 02886
                                               Phone: (401) 739-9690; Fax (401) 739-9040
                                               smk@sinapilaw.com; ras@sinapilaw.com